**Sheldon L. Pollock**
**Lee A. Greenwood**
**George Stepaniuk**
**Elisa S. Solomon**
**Margaret Spillane**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-0427 (Solomon)**
**SolomonEl@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ANDREW SPAVENTA, THE SPAVENTA GROUP LLC, TSG CAPITAL ADVISORS LLC, And TSG ALPHA PARTNERS LLC,**<br><br>**Defendants.** | **<u>COMPLAINT</u>**<br><br>**26 Civ. 6958**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendants Andrew Spaventa ("Spaventa"), The Spaventa Group LLC ("TSG"), TSG Capital Advisors LLC ("Capital Advisors"), and TSG Alpha Partners LLC ("Alpha Partners") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1. This action arises from Defendants' fraudulent, unregistered securities offerings of investment vehicles that purported to provide retail investors with the opportunity to invest in shares of private companies that may undertake an initial public offering. Defendants pitched these offerings as unique investment opportunities in highly-coveted, limited-supply shares not yet

available on a public stock exchange, while using false and misleading statements to charge investors hidden fees.

2. From approximately December 2020 through at least June 2025 (the "Relevant Period"), Defendants raised over $74 million from more than 800 mostly retail investors across the United States, including in this District, for eleven private funds (individually, a "Fund"; collectively, the "Funds"). Defendants operated boiler rooms (call center operations using aggressive sales pitches) from which more than 100 "sales agents" over the course of the Relevant Period cold-called and pitched the Funds to thousands of prospective investors, many of them retirees. Spaventa and his managers trained these sales agents using scripts and employee handbooks filled with high-pressure sales tactics, and Spaventa directed the agents to market the firm as charging no hidden fees.

3. Contrary to these representations to prospective investors, Spaventa—through the remaining Defendants—charged investors massive hidden fees. To do so, Spaventa used TSG and another entity he wholly owned to acquire shares in private companies, either directly or through another investment fund (the "Pre-IPO Securities"). Spaventa then caused these entities to sell the Pre-IPO Securities to the Funds at substantially marked-up prices. Defendants passed on these marked-up prices to investors by embedding hidden fees in the prices at which Defendants sold membership interests in the Funds ("Interests"). The prices paid for Interests—which Defendants characterized as the "Unit" price of the Pre-IPO Securities held by the Fund—were on average approximately 46% higher than the prices Spaventa paid for the Pre-IPO Securities.

4. Defendants nonetheless falsely and misleadingly told prospective investors—through sales agents and offering documents—that they would be charged either no upfront fees or upfront fees of no greater than 12.5%. In fact, by passing along the full re-sale markups paid by the Funds, Defendants charged investors much larger upfront fees. And, despite the fact that Defendants

always marked up the prices of Pre-IPO Securities sold to the Funds, and had already charged these markups for all but the first Fund by the time any Interests were sold, Spaventa and TSG misleadingly stated in offering documents that affiliates of the Fund "may" receive income from these sales. Spaventa and entities under his control—TSG and, beginning in May 2024, Alpha Partners—served as investment advisers to the Funds and thus breached their fiduciary duties to the Funds by charging these undisclosed markups.

5. During the Relevant Period, Defendants collected a total of approximately $23 million in upfront fees from unsuspecting investors. Spaventa personally enriched himself by at least $4 million from these fees, which he used for personal expenses such as luxury car payments and home renovations. Defendants also used over $12 million from the upfront fees to pay commissions to their sales agents. As for Fund investors, the vast majority have not recouped their investments and some have already incurred total or near-total losses.

6. Defendants' sales agents also made additional misrepresentations to investors about the Funds. Sales agents falsely claimed that the supply of remaining Units was scarce or nearly exhausted, regardless of how many Units actually remained available for sale. Sales agents also falsely touted extraordinary investment returns, ranging from 200% to 1,000%, without any reasonable basis, by relying on false statements concerning TSG's track record of prior investments. And, sales agents misled investors concerning Defendants' proffered valuations of the Pre-IPO Securities, falsely claiming that Unit prices reflected the "market value" of the Pre-IPO Securities when, in fact, these prices included Defendants' hidden fees, which raised the prices investors paid well above market value.

7. In addition to their fraud on investors and the Funds, Defendants violated the securities and broker-dealer registration provisions of the securities laws. None of the Interests were sold pursuant to a registration statement filed with the Commission and no exemption from

registration appears to have applied to these securities offerings. In addition, TSG, at Spaventa's direction, operated as an unregistered broker-dealer by employing sales agents not associated with a registered broker-dealer and paying them commissions to solicit Fund investors.

**VIOLATIONS**

8. By virtue of the foregoing conduct and as alleged further herein: (a) Defendants have each violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) Defendants Spaventa, TSG, and Alpha Partners have violated Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and (c) Defendants Spaventa and TSG have violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)]. Defendant Spaventa is also liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder by Defendants TSG, Capital Advisors, and Alpha Partners; and for violations of Exchange Act Section 15(a)(1) by Defendant TSG. Additionally, Defendant Spaventa is liable under Securities Act Section 15(b) [15 U.S.C. § 77o(b)] and Exchange Act Section 20(e) [15 U.S.C. §§ 78t(e)] for aiding and abetting violations of (i) Securities Act Sections 5(a), 5(c), and 17(a), and Exchange Act Section 10(b) and Rule 10b-5 thereunder, by Defendants TSG, Capital Advisors, and Alpha Partners; (ii) Exchange Act Section 15(a)(1) by Defendant TSG; and (iii) Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) and Rule 206(4)-8 thereunder by Defendants TSG and Alpha Partners.

9. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)]; Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

11. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) permanently restraining and enjoining Spaventa from directly or indirectly, acting as, or being associated with, any broker, dealer, or investment adviser; (c) permanently restraining and enjoining Spaventa from, directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account; (d) ordering Defendants, on a joint and several basis, to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (e) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)]; Exchange Act Section 27 [15 U.S.C. § 78aa]; Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)], and 28 U.S.C. § 1331.

13. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue is proper in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain acts, practices, transactions, and courses of business alleged in this Complaint occurred in this District, including offers of Interests to numerous prospective investors located in this District and sales of Interests to at least 20 investors located in this District who collectively invested nearly $2 million in the Funds.

15. Spaventa and TSG each entered into a tolling agreement ("Tolling Agreement") with the Commission staff.

16. Each Tolling Agreement specifies a period of time ("tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Spaventa or TSG] authorized, instituted, or brought by or on behalf of the Commission or to which the Commission is a party arising out of the [Commission's investigation of Spaventa's and TSG's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended." Each Tolling Agreement further provides that Spaventa and TSG, including their agents and attorneys, "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense."

17. The tolling period for each Tolling Agreement runs from January 29, 2025, through May 31, 2026.

## DEFENDANTS

18. **Spaventa**, age 40, resides in Miller Place, New York. He is the founder, chief executive officer, and sole owner of TSG. Spaventa is also the indirect majority owner of Capital Advisors and Alpha Partners. Between March 2013 and June 2019, Spaventa was associated with four different Commission-registered broker-dealers as a registered representative. In September 2019, the Financial Industry Regulatory Authority ("FINRA") suspended Spaventa from associating with any FINRA member for failing to pay an arbitration award that resulted from a customer complaint. FINRA lifted the suspension in December 2019, after Spaventa paid the award. Spaventa has been an investment adviser representative associated with Alpha Partners since January 2022, and a registered representative associated with Capital Advisors since May 2024. Spaventa currently holds Series 7, 24, and 65 licenses.

19. **TSG** is a Delaware limited liability company formed in September 2020 by Spaventa, who is its sole owner. TSG's current principal place of business is in Hauppauge, New York; during the Relevant Period, its principal place of business was in Ronkonkoma, New York. TSG has also operated offices in New Jersey since at least September 2022. Spaventa used TSG or TSG affiliates to solicit investors in all the Funds, to pay sales agents between at least February 2021 and June 2025, and to acquire Pre-IPO Securities that were sold to at least nine of the eleven Funds. Until May 2024, TSG was the manager, managing member, and investment adviser for the first three Funds. TSG has never been registered with the Commission in any capacity.

20. **Capital Advisors** is an entity doing business on behalf of Brightchoice Financial, LLC ("Brightchoice"), a Tennessee limited liability company formed in January 2007. Brightchoice has been registered with the Commission as a broker-dealer since October 2008. Spaventa purchased Brightchoice in or about March 2024. In May 2024, Spaventa began operating Brightchoice under the name Capital Advisors and, since December 2024, Capital Advisors has

served as a placement agent for the Funds. Beginning in April 2024, certain TSG sales agents became associated with Capital Advisors, eventually becoming registered representatives. These registered representatives received payments, including commissions, from Capital Advisors between at least January 2025 and June 2025. Capital Advisors operates out of the same offices as TSG and shares employees with TSG.

21. **Alpha Partners** is a Delaware limited liability company formed by Spaventa in November 2021. Through his ownership of TSG, Spaventa currently owns more than 95% of Alpha Partners. Certain of Spaventa's sales agents became associated as investment adviser representatives with Alpha Partners as early as October 2022. Beginning in May 2024, Alpha Partners served as investment adviser to nine of the eleven Funds. In February 2025, Alpha Partners registered with the Commission as an investment adviser. Alpha Partners operates out of the same offices as TSG and shares employees with TSG.

## OTHER RELEVANT ENTITIES

22. The **Funds** are TSG Venture Fund LLC ("Fund 1"), TSG Secondary Fund LLC ("Fund 2"), TSG Strategic Secondary Fund LLC ("Fund 3"), TSG Strategic Secondary Fund 2 LLC ("Fund 4"), TSG Secondary Fund 2 LLC ("Fund 5"), TSG Secondary Fund 3 LLC ("Fund 6"), TSG Secondary Fund 4 LLC ("Fund 7"), TSG Secondary Fund 5 LLC ("Fund 8"), TSG Secondary Fund 6 LLC ("Fund 9"), TSG Vision Fund Series AI 1024 LLC ("Fund 10"), and TSG Vision Fund Series 1 LLC ("Fund 11"). None of the Funds were or are registered with the Commission in any capacity.

23. **TSG Invest Ventures LLC** ("TSG Invest") is a Delaware limited liability company with its principal place of business in Hauppauge, New York. Spaventa formed TSG Invest in November 2024 and wholly owns TSG Invest through TSG. Spaventa used TSG Invest to acquire the Pre-IPO Securities for Funds 10 and 11.

24. **StraightPath Venture Partners LLC** ("StraightPath") was a manager of private funds that purported to hold Pre-IPO Securities and raised at least $410 million from more than 2,200 investors between November 2017 and February 2022. TSG used money raised from investors in the first two Funds to invest in Pre-IPO Securities purportedly held in certain of StraightPath's funds. StraightPath is the subject of a previously filed Commission enforcement action and is currently under receivership. *See SEC v. StraightPath Venture Partners, LLC, et al.*, 22 Civ. 3897 (LAK) (S.D.N.Y. filed May 13, 2022). The Commission's action against StraightPath alleges, among other things, that it sold fund interests in more Pre-IPO Securities than it owned and that it charged hidden markups and fees. StraightPath's principals were charged in a parallel criminal case in November 2023, convicted at trial in November 2025, and sentenced in May 2026 to terms of imprisonment of between eight and eleven years. *See United States v. Michael Castillero, et al.*, 23 Cr. 622 (JMF) (S.D.N.Y. indicted Nov. 28, 2023).

## FACTS

### I. BACKGROUND

25. Pre-IPO Securities provide an opportunity for investors to invest in a private company that could potentially undertake an IPO (a "Pre-IPO Company").

26. Pre-IPO Securities generally are held by early-stage investors, company employees, or investment funds, and are not publicly traded.

27. Pre-IPO Securities can be attractive to investors due to the potential for high returns if the Pre-IPO Company undertakes an IPO or experiences another event that allows investors to convert their equity into shares or cash (a "liquidity event") and high demand exists for its shares, allowing the Pre-IPO Securities to be sold at a profit.

28. Investment vehicles such as the Funds, which purchase Pre-IPO Securities either directly from shareholders or through investments in other investment vehicles holding the Pre-IPO Securities, provide the broader investing public with access to Pre-IPO Securities.

29. Spaventa has been involved in selling interests in investment funds purporting to hold Pre-IPO Securities for at least seven years.

30. Beginning in or around late 2018, Spaventa was a registered representative associated with Salomon Whitney LLC, d/b/a SW Financial ("SW Financial"), a broker-dealer formerly registered with the Commission.

31. While at SW Financial, Spaventa helped raise money from investors for pre-IPO investment funds managed by StraightPath.

32. In May 2023, FINRA expelled SW Financial in connection with allegations that the firm had misrepresented its fees related to sales of Pre-IPO Securities.

33. Beginning in May 2020, Spaventa worked with a former business partner to launch pre-IPO funds they managed through another entity, which raised approximately $4.5 million from investors. Spaventa used these investor proceeds to invest in StraightPath's funds.

## II. DEFENDANTS' SECURITIES OFFERINGS

### A. Background on the Funds

34. In September 2020, Spaventa founded TSG, and in December 2020, sales agents, at Spaventa's direction, began selling Interests in Fund 1.

35. The Funds were marketed to investors as an opportunity to obtain an economic stake in highly sought-after Pre-IPO Companies.

36. During the Relevant Period, each Defendant directly and/or indirectly offered and sold securities in the form of Interests.

37. The private placement memoranda ("PPMs") for each of the Funds stated that the purpose of the Fund was to invest in the securities of Pre-IPO Companies.

38. Each of the eleven Funds purportedly held set numbers of Pre-IPO Securities.

39. The first two Funds, Fund 1 and Fund 2, invested in the Pre-IPO Securities of multiple Pre-IPO Companies. The remaining nine Funds each invested in the Pre-IPO Securities of only one Pre-IPO Company.

40. In exchange for their Fund investments, investors received Interests, which investors were told represented a specific number of Units of a Pre-IPO Company held by the Fund at a specific price per Unit.

41. Spaventa served as investment adviser to the Funds, including through his ownership and operation of TSG and Alpha Partners.

42. The PPMs for Funds 1, 2, 3, 10, and 11 listed Spaventa as the founder and chief executive officer of the Fund manager.

43. The Fund Manager was tasked with selecting, recommending, and monitoring Fund investments, among other responsibilities.

44. TSG was the manager, managing member, and investment adviser to Funds 1–3. Spaventa used two other entities he wholly owned to serve as the manager, managing member, and investment adviser to Funds 4-11.

45. In May 2024, Spaventa began providing investment advice to the Funds through Alpha Partners and, in December 2024, began using Capital Advisors as placement agent for the Funds.

46. Defendants raised a total of $74 million by selling Interests in the eleven Funds to a total of more than 800 investors located in 49 states, the District of Columbia, and at least ten other countries.

47. Most investors in the Funds are retail investors, including more than 100 retirees. More than 650 individual Fund investors invested a total of $100,000 or less, and more than 220 invested a total of $20,000 or less.

48. In addition to using proceeds from the sales of Interests to purchase Pre-IPO Securities, Spaventa, through Defendants, used the proceeds to pay approximately $12 million to sales agents and to pay himself approximately $4 million, including to cover personal expenses such as a home purchase, home renovation costs, personal travel, and luxury car payments.

49. Alpha Partners received approximately $750,000 in investor money, while Alpha Partners received approximately $465,000, which these entities used to pay sales agents and operational expenses, among other things.

**B. Defendants' Solicitations of Investors**

50. Over the course of the Relevant Period, Defendants employed more than 100 sales agents in offices in New York and New Jersey.

51. TSG and, during certain periods, Capital Advisors and Alpha Partners, paid these sales agents transaction-based compensation, or commissions, based on the amount of investor capital the sales agents raised for the Funds each month (typically 10%).

52. Many of these sales agents had no background in private investment funds, and the vast majority were not registered with FINRA or associated with a registered broker-dealer during the Relevant Period.

53. At the time they solicited investments in the Funds, several sales agents had been suspended or barred by FINRA.

54. Defendants' sales agents made cold calls using lead lists of potential investors provided by TSG.

55. Spaventa provided sales agents with materials that he drafted and/or approved including an "Apprenticeship Manual" provided to new sales agents and an employee handbook (the "Handbook"), both of which emphasized ways that sales agents should "close" transactions with high-pressure tactics.

56. For example, the Apprenticeship Manual directed sales agents to convey a "sense of urgency" when speaking to investors

57. Similarly, the Handbook directed sales agents to create a "[s]ense of [u]rgency" by claiming an investment "needs to be done ASAP before the price increase or we run out of supply."

58. Spaventa and other TSG employees working at his direction trained sales agents using scripts that directed sales agents to put pressure on prospective investors.

59. Spaventa personally monitored email communications with investors and recorded telephone calls made by sales agents, which were then used in roleplaying exercises to train sales agents on how to solicit investors.

60. Sales agents sent some potential investors a TSG-branded whitepaper about venture capital investing, which was also posted on TSG's public website (the "TSG Whitepaper").

61. In addition, sales agents typically provided prospective Fund investors the following written materials: a PPM, a subscription agreement, a questionnaire concerning the investor's status as an accredited investor, an operating agreement for the Fund limited liability company in which Interests were being offered, and, after the investor was accepted into the Fund, a "Confirmation Letter" (collectively, the "Offering Documents").

62. The Confirmation Letters sent to investors generally included the amount of their investment, the Fund in which the investor had purchased Interests, and the number of Units and price per Unit that corresponded to the Interests the investor purchased.

## III. DEFENDANTS' FRAUDULENT CONDUCT

### A. Defendants Charged Undisclosed Markups and Hidden Fees

#### i. Spaventa Charged Undisclosed Markups on the Sales of Pre-IPO Securities to the Funds

63. The Funds did not acquire Pre-IPO Securities directly; rather, Spaventa caused two entities he wholly owned—TSG and TSG Invest—to acquire the Pre-IPO Securities, and those two entities, in turn, sold the Pre-IPO Securities to the Funds.

64. TSG and TSG Invest purchased over 90% of the Pre-IPO Securities held by the Funds by investing in other pre-IPO investment funds purporting to hold interests in the shares of Pre-IPO Companies, not through fundraising rounds or direct purchases from shareholders.

65. Spaventa was the sole person responsible for selecting the Pre-IPO Securities for the Funds; determining how and at what price TSG or TSG Invest would acquire the Pre-IPO Securities and sell them to the Funds; and setting the per Unit price paid by Fund investors.

66. TSG purchased all the Pre-IPO Securities purportedly held by Fund 1 and many of the Pre-IPO Securities held by Fund 2 by investing in StraightPath's funds.

67. TSG or TSG Invest largely purchased the Pre-IPO Securities held by the remaining Funds (Funds 3–11) through investments in other pre-IPO funds.

68. Fund investors were instructed to send their investments to bank accounts in the name of the Fund in which they were investing.

69. Spaventa had signatory authority for each Fund bank account and in some cases was also listed as the beneficial owner for those accounts.

70. Investors in Fund 1 sent money to the Fund 1 bank account, a portion of which was sent directly to StraightPath's funds to acquire Pre-IPO Securities on behalf of TSG and the remainder of which was sent to TSG accounts controlled by Spaventa.

71. For Funds 2–11, Spaventa caused TSG or TSG Invest to purchase an initial tranche of Pre-IPO Securities prior to any sales of Interests to investors; Spaventa then used investor money to buy additional Pre-IPO Securities on behalf of TSG or TSG Invest so that he could sell more Interests to investors after the first tranche was sold.

72. For Funds 2-11, investors' money was transferred routinely to, and commingled with other funds deposited in, TSG bank accounts or bank accounts of other entities Spaventa owned.

73. In all instances, Spaventa did not send money from the Funds to TSG or TSG Invest for the Funds' purchases of Pre-IPO Securities until after investors had purchased Interests.

74. Spaventa generally purported to transfer the Pre-IPO Securities from TSG or TSG Invest to the Funds using "equity transfer agreements" that he signed on behalf of TSG, and which he directed a TSG employee to sign on behalf of each of the Funds.

75. These equity transfer agreements generally do not identify the source from which TSG or TSG Invest acquired the Pre-IPO Securities.

76. Spaventa finalized some of these equity transfer agreements at or around the time of a voluntary inquiry by the staff of the Commission's Division of Examinations ("Examinations") that began in or about July 2023, but backdated the agreements to make them appear as if they had been finalized months or years earlier.

77. For example, although Spaventa did not create and finalize the equity transfer agreements for the sales of Pre-IPO Securities to Fund 1 until sometime in 2023, the agreements were backdated to suggest that the transaction had closed and been executed in or around February 2021.

78. Because TSG or TSG Invest sold Pre-IPO Securities to the Funds, and because TSG, TSG Invest, and the Funds were all controlled by Spaventa, these transactions were principal transactions that were facilitated by Spaventa, TSG, and Alpha Partners.

79. Under the Advisers Act, a principal transaction occurs when an investment adviser buys securities from, or sells securities to, a client using the firm's own account or inventory and, pursuant to Advisers Act Section 206(3), such transactions require that the investment adviser obtain notice and written consent from such clients.

80. However, Spaventa did not obtain written consent from the Funds prior to any sale of Pre-IPO Securities by TSG or TSG Invest to the Funds.

81. The Funds did not have boards of directors that could provide consent to principal transactions; nor did Spaventa establish an investor advisory committee or engage a third party to evaluate, on behalf of the Funds, whether these purchases of Pre-IPO Securities were in the Funds' best interests.

82. As described in more detail below, the prices at which the Funds purchased Pre-IPO Securities from TSG or TSG Invest were substantially higher than the prices at which TSG or TSG Invest acquired them.

**ii. Defendants Passed their Undisclosed Markups on to Fund Investors as Hidden Upfront Fees**

83. Throughout the Relevant Period, Defendants misled Fund investors about the markups charged to the Funds that were then passed on to investors as upfront fees included in the prices of Interests.

84. Defendants did not disclose to Fund investors either the prices at which Spaventa acquired the Pre-IPO Securities or that significant markups were included as upfront fees in the Unit prices paid by investors.

85. Through false and misleading statements by sales agents to prospective investors, and in written materials provided to such investors, investors were led to believe that they would pay either no upfront fees or fees of at most 12.5%.

86. However, investors were paying much higher upfront fees; as detailed in the chart below, the prices (inclusive of fees) investors paid for Interests were approximately 27% to 91% more than the prices (inclusive of fees) TSG or TSG Invest paid for the underlying Pre-IPO Securities:

| Fund | Pre-IPO Securities | TSG or TSG Invest Acquisition Price | Fund Investor Price | Markup Range | Approximate Period of Investor Sales | Amount Raised |
|---|---|---|---|---|---|---|
| Fund 1 | Eat Just | $17.50 | $25.00 | 43% | Dec. 2020 – May 2021 | $3,870,018 |
| | Impossible Foods | $29.00 | $39.00 | 35% | | |
| | Plaid | $1,350.00 | $1,890.00 – $1,950.00 | 40% – 44% | | |
| | Rubrik | $27.00 – $50.00 | $38.00 – $70.00 | 40% – 41% | | |
| | Scopely | $55.00 | $78.00 | 42% | | |
| | Zipline | $45.00 | $65.00 | 44% | | |
| Fund 2 | Epic Games | $1,196.00 – $1,494.47 | $2,250.00 | 51% – 88% | May 2021 – Jan. 2023 | $22,802,813 |
| | Kraken | $54.06 – $61.95 | $79.00 – $88.00 | 42% – 63% | | |
| | Impossible Foods | $31.85 | $48.00 | 51% | | |
| | Plaid | $1,350.00 | $1,890.00 | 40% | | |
| | Rubrik | $50.00 | $70.00 | 40% | | |
| | SpaceX | $595.00 | $975.00 | 64% | | |
| | VIA Motors | $10.50 | $20.00 | 91% | | |
| Fund 3 | Anduril | $17.89 – $19.81 | $26.90 – $28.15 | 36% – 57% | June 2022 – June 2023 | $11,847,239 |
| Fund 4 | Stripe | $22.67 – $26.51 | $35.50 – $37.00 | 40% – 63% | May 2023 – Sept. 2023 | $7,142,458 |
| Fund 5 | Anduril | $19.34 – $20.47 | $25.00 – $28.15 | 29% – 46% | June 2023 – Jan. 2024 | $5,126,619 |
| Fund 6 | Stripe | $27.12 – $28.40 | $39.77 – $41.62 | 40% – 54% | Sept. 2023 – Mar. 2024 | $4,730,656 |
| Fund 7 | Anduril | $20.47 – $25.31 | $26.90 – $32.62 | 29% – 38% | Dec. 2023 – Aug. 2024 | $4,848,207 |
| Fund 8 | Anthropic | $32.62 – $41.53 | $58.50 | 41% – 79% | Feb. 2024 – July 2024 | $5,796,568 |

| Fund | Pre-IPO Securities | TSG or TSG Invest Acquisition Price | Fund Investor Price | Markup Range | Approximate Period of Investor Sales | Amount Raised |
|---|---|---|---|---|---|---|
| Fund 9 | Relativity Space | $22.83 | $32.62 | 43% | June 2024 – Jan. 2025 | $2,657,292 |
| Fund 10 | Perplexity AI | $340.72 – $374.08 | $495.00 | 32% – 45% | Dec. 2024 – Mar. 2025 | $2,504,720 |
| Fund 11 | Perplexity AI | $374.08 – $389.00 | $495.00 | 27% – 32% | Mar. 2025 – June 2025 | $2,718,350 |

1. *Offering Documents Misrepresented Upfront Fees*

87. Spaventa drafted or reviewed and approved, each version of the Offering Documents, including the PPMs and Confirmation Letters, prior to their dissemination to prospective investors.

88. Spaventa initially modeled several of the Offering Documents, including the PPMs and Confirmation Letters, on the offering documents for StraightPath's funds, including those documents' descriptions of applicable fees.

89. Like the PPMs for the StraightPath funds, the PPMs for the Funds stated that the manager of the Funds is entitled to "carried interest" equal to 20% of the Fund investors' profits after any IPO or other liquidity event.

90. The PPMs for the Funds also included language nearly identical to the StraightPath PPMs concerning markups, misleadingly stating that TSG or its affiliates *may* receive income from sales of Pre-IPO Securities to the Funds (the "Affiliate Income Disclosure").

91. For example, the Affiliate Income Disclosure in the Fund 1 PPM provided:

**Mark-Ups**................................ Spaventa Affiliates may, to the extent permissible by law, may receive income generated from the sale of Interests with an underlying price per share of Portfolio Company security that is higher to the Fund than the price per share paid by the affiliate for such security. None of the aforementioned fees or profits shall be shared with the Fund.

92. The PPMs for later Funds included this language in sections identified as the "Front-Load" (Fund 2), "Front-Load Fee" (Fund 3), "Fund Fees" (Funds 4-9), or "Fees and Expenses" (Funds 10-11), rather than "Mark-Ups."

93. The Affiliate Income Disclosure in the PPMs was false and misleading because, as Defendants knew at the time, Defendants received such income from *every* sale of Interests to *every* investor. In fact, this income was an essential part of Defendants' business model.

94. The Affiliate Income Disclosure was also false and misleading because, by the time Defendants sold Interests to investors for all but the first Fund, Defendants had *already* generated such income through the sales of Pre-IPO Securities to the Funds at prices higher than those at which TSG or TSG Invest had acquired those securities.

95. Moreover, the PPMs for Funds 1–9 stated that TSG's affiliates would receive this income only "to the extent permissible by law."

96. In fact, the sales of Pre-IPO Securities from TSG or TSG Invest to the Funds were not "permissible by law" because, as noted above, they were principal transactions that required notice and written consent from the affected Funds and their investors—who, in fact, were misled concerning these transactions and provided no such consent.

97. In addition to the false Affiliate Income Disclosure, Spaventa included language about fees in the PPMs and Confirmation Letters that was both internally contradictory and, collectively, misleading.

98. In general, the PPMs and Confirmation Letters misleadingly advised Fund investors that they were being charged either no upfront fees or, at most, 12.5% in upfront fees.

99. The PPMs for Funds 1 and 2 did not state whether or not a "Mark-Up" or "Front-Load" fee had in fact been charged or the amount of any such fee. These PPMs also falsely and

misleadingly stated that "[t]here are no fees associated with the Fund other than the Carried Interest[.]"

100. Likewise, generally, Confirmation Letters sent to investors in Funds 1 and 2 falsely stated that no upfront fees had been deducted from investors' capital contributions, listing "0%" and "$0.00" next to several fee categories.

101. Contrary to these representations, the Unit prices paid by investors in Funds 1 and 2 included markups of between 35% and 91%.

102. As noted above, the PPMs for Funds 3–9 stated that the income identified in the Affiliate Income Disclosure would be "in the form of" a one-time charge of either 12.5% or 7.5%—which the Fund 3 PPM called a "one-time up front fee" or "front-load fee," and the PPMs for Funds 4–9 PPMs called an "organization charge."

103. The PPMs for Funds 3–9 likewise falsely and misleadingly stated that "[t]here are no fees associated with the Fund other than the [Front-Load or Organization Charge] . . . and the Carried Interest."

104. Beginning with Fund 3, the PPMs included language falsely and misleadingly suggesting that the prices the Funds paid TSG or TSG Invest for Pre-IPO Securities, as described in the Affiliate Income Disclosure, reflected the "market value" of these Pre-IPO Securities.

105. Similarly, the PPMs for Funds 4–9 falsely and misleadingly stated that, "in addition to the fund fee," TSG "may" collect income as disclosed in the Affiliate Income Disclosure by offering the Pre-IPO Securities "to the Fund at a higher 'market value' price per share."

106. The PPMs for Funds 3–9 also added a hypothetical suggesting that the 7.5% or 12.5% fee would be applied on top of any markup in the sale from TSG to the Funds.

107. Contrary to these representations, as detailed below, the prices the Funds paid TSG or TSG Invest for Pre-IPO Securities were not "market value."

108. Generally, the Confirmation Letters sent to investors in Funds 3–9 likewise misleadingly stated that investors would be charged no fees other than the front-load fee or organization charge and Carried Interest.

109. However, the Unit prices paid by investors in Funds 3–9 were between 29% and 79% higher than the prices TSG paid for the underlying Pre-IPO Securities.

110. The PPMs for Funds 10 and 11, like the PPMs for Funds 1 and 2, included the Affiliate Income Disclosure but omitted any reference to 7.5% or 12.5% fees, and falsely and misleadingly stated that "[t]here are no fees associated with the Fund other than the Carried Interest[.]"

111. The PPMs for Funds 10 and 11 introduced references to additional fees associated with Capital Advisors (as a placement agent for the Funds) and Alpha Partners (as an investment adviser to the Funds). Both PPMs stated that Capital Advisors "shall receive" a "commission" (Fund 10) or "placement fee" (Fund 11) for each transaction it completes for the Fund and that Alpha Partners "will receive" an "Investment Advisor Fee."

112. The PPMs noted that these fees "were not necessarily determined on an arm's length basis" but did not identify any specific dollar amount or percentage associated with these fees, and therefore did not put Fund investors on notice of the enormous markups the Funds were paying for the Pre-IPO Securities.

113. Moreover, the PPMs for Funds 10 and 11 misleadingly stated that "the Manager [i.e., TSG] will not receive any separate regular fee in exchange for management of the Fund" other than Carried Interest when in fact TSG continued to collect the income from the sales of Pre-IPO Securities to the Funds.

114. A one-page document sent to certain investors in Fund 10 said the "placement fee" was 10% but still noted that the "fee is variable and subject to adjustment or waiver."

115. The Confirmation Letters for Funds 10 and 11 provided no information about fees whatsoever.

116. Despite these representations, investors in Funds 10 and 11 paid Unit prices between 27% and 45% higher than the prices TSG Invest paid for the underlying Pre-IPO Securities.

*2. Sales Agents, at Spaventa's Direction, Made False and Misleading Statements to Investors Concerning Upfront Fees*

117. During the Relevant Period, sales agents, at Spaventa's direction, repeatedly misled investors concerning the upfront fees associated with investors' purchases of Interests.

118. Following scripts and other training materials that Spaventa provided to them, sales agents misled investors by telling them that the Funds charged either no upfront fees at all or upfront fees of at most 12.5%.

119. To ensure that sales agents would not and could not disclose to investors the prices at which TSG or TSG Invest acquired the Pre-IPO Securities, Spaventa withheld this information from sales agents.

120. The Handbook advised sales agents that, if asked how much the Funds had paid for Pre-IPO Securities, the agents should respond, "I'm not sure, but that's not information I'm privy to. Management negotiates pricing and deal terms and then tells us the pricing."

121. Through the Handbook, Spaventa also trained sales agents to falsely describe to prospective Fund investors that TSG's fees were minimal as compared to their competitors. Specifically, the Handbook directed sales agents to convey to prospective investors that:

> Unlike other firms, we have no hidden fees. Other firms will charge management and due diligence fees to clients, we do not. So the price we tell you is the price of the investment. And upon the liquidity event we participate in profits by taking 20%.

122. Likewise, the TSG Whitepaper falsely claimed that while "there may be hidden fees (including management fees, due diligence fees, etc.) associated with other firms' offerings, TSG always discloses all fees up front and does not charge any extra hidden fees."

123. Consistent with their training, sales agents provided misleading information to investors concerning Fund fees and suggested to at least some prospective Fund investors that Defendants would profit only if the investor profited.

124. For example, in a July 2022 call with a prospective investor concerning Kraken Pre-IPO Securities held by Fund 2, a sales agent responded to an investor's question about what would happen if the investment lost money by falsely stating, "you don't make any money and we don't make any money either, right."

125. In fact, TSG immediately profited when investors purchased Interests in Fund 2 backed by Kraken Pre-IPO Securities because investors paid Unit prices 42% to 63% higher than the price that TSG paid for these Pre-IPO Securities.

126. Likewise, in a February 2023 email to a potential investor concerning Fund 4, a sales agent sought to reassure the prospective investor—who had "backed away" from a different potential investment because of his "views on fees and carried interest"—by telling the investor, "[i]f we bring you a dud, you don't make money and neither do we."

127. A script of "Objections & Rebuttals" for pitching investors in the Funds holding Anduril Pre-IPO Securities, which was widely circulated among various sales agents in February 2023, stated that:

> What separates us from the rest is that we will not rip you off with unnecessary fees. Like I said, no 2% management fee, no 1-5% due diligence fee, and no hidden fees. And most importantly, we are invested right along side of you. When you make money, we make money. If you don't make money, we don't make money.

128. Similarly, in approximately March 2025, Spaventa emailed investors in several Funds holding Anduril Pre-IPO Securities, misleadingly stating, "[o]ur team has become aware of a specific group claiming to offer access to Anduril at a significant discount to the current funding round price," and he "advise[d] caution regarding any firm offering investments in companies substantially below the last funding round price, as these opportunities often involve hidden fees, 'upfront carried

interest,' or other obscured compensation structures that investors may only discover upon a liquidity event."

129. Although Spaventa sought to contrast this competitor by suggesting it was charging "hidden fees," in reality, Interests in Funds holding Anduril Pre-IPO Securities themselves included fees of 29% to 57% of which only (at most) 12.5% were disclosed.

130. As a result of the misrepresentations to investors about upfront fees, Defendants secured immediate, substantial profits for themselves regardless of whether investors themselves make a profit or even recoup their investments.

**B. Defendants Misled Investors Concerning the Value of Pre-IPO Securities**

131. Defendants pitched investments in the Funds as unique and highly profitable investment opportunities.

132. As described below, Defendants' sales pitches included various misrepresentations that overstated the value of Pre-IPO Securities.

**i. Defendants Misleadingly Claimed That Investors Were Paying a Calculated "Market Value" for Pre-IPO Securities**

133. Through statements in the Offering Documents and by sales agents, Defendants misrepresented to investors that the prices of Interests, inclusive of fees, were calculated with reference to the market value of the underlying Pre-IPO Securities; and that Defendants had conducted data-intensive valuations that supported their promises of expected investment returns.

134. In truth, the prices Defendants charged investors for Interests in each of the Funds was calculated based on Defendants' revenue targets, not based on any calculation of intrinsic "market value."

135. For example, in an October 2023 email to a TSG employee, Spaventa explained that TSG's business "model of collecting most management fees upfront instead of spreading it out over years . . . allows me to generate a larger amount of revenue upfront to use to grow the company";

and he then noted that, "in order to maintain a 20% margin", the Fund "must charge at least 25% over purchase price."

136. In other words, Defendants used margin targets as the actual basis for Interest prices charged to investors, while falsely representing to investors that they had calculated Interest prices based on the value of the Pre-IPO Securities.

137. The PPMs for all but the first two Funds included misleading language suggesting that the difference between the price at which TSG or TSG Invest acquired Pre-IPO Securities and the price at which they sold Pre-IPO Securities to the Funds was calculated in reference to a "market value."

138. For example, the PPM for Fund 3 falsely and misleadingly stated that "[t]he main objective of this Fund is to provide investors with access to companies with attractive valuations compared to prevailing market rates at the time of initial investment"; and that Fund 3 held Pre-IPO Securities priced below valuations from a prior funding round, or below the average secondary market pricing, among other things.

139. The PPM for Fund 3 further falsely and misleadingly stated that "Interests in companies held within this Fund are acquired directly from the TSG portfolio at market value."

140. All of the PPMs for Funds 4–11 falsely and misleadingly stated that, "[w]hen determining the price of the interests to be sold to the Fund, [the Manager] derives a market value using a combination of several metrics (including appreciation) that it employs in its pricing mechanism (such market value can be higher than the price actually paid for the investments by [TSG or its affiliates])."

141. Defendants also misleadingly described their calculations of market value of Interests as data-driven.

142. For example, the Handbook directed sales agents to answer questions about how TSG arrived at the price for Interests by falsely and misleadingly stating, "our data and network is top notch so we've been pretty on point when it comes to valuation"; and that the valuation provided to investors "includes our fees."

143. In addition, Spaventa prepared "Investment Memoranda" for Pre-IPO Companies and shared them with prospective investors. These Investment Memoranda sought to bolster the assertion that prices paid by investors were calculated in reference to a market value and, in some cases, that TSG or TSG Invest had acquired the Pre-IPO Securities at a discount to that market value.

144. However, Defendants misleadingly failed to disclose to prospective investors that their estimated returns on investment were based on TSG's or TSG Invest's acquisition prices, which were far lower than the Unit price charged to investors.

145. Moreover, the Unit prices investors paid typically exceeded the then-current market prices for the underlying Pre-IPO Securities, according to publicly available price information concerning the secondary market for these Pre-IPO Securities, including from Commission Form N-PORT X data sets, Hiive, Nasdaq Private Market, and Forge Global, Inc.

146. For example, Defendants sold Units of VIA Motors as part of Fund 2 at $20 per Unit, which was 91% higher the price TSG paid for VIA Motors Pre-IPO Securities.

147. Defendants even continued to sell VIA Motors Units at this price point through September 17, 2021, after a third-party company publicly announced in August 2021 that it had agreed to purchase VIA Motors at a price that would mean that VIA Motor's existing shareholders would be significantly diluted.

148. As a result, investors in Fund 2 who purchased Interests backed by Units of VIA Motors lost nearly $1.2 million dollars whereas TSG received nearly $600,000 in hidden upfront fees included in the price of the corresponding Interests.

149. Likewise, a June 2022 newsletter sent to prospective investors in Fund 3 claimed that TSG was able "to find unique, special situations where a target company's shares are able to be acquired at a discount to prevailing private market prices" and that TSG would "be passing on similarly discounted pricing on these select opportunities to our valued clientele."

150. In an Investment Memorandum for Anduril sent to some prospective investors in Funds 3, 5, and 7, TSG claimed that it had secured Anduril Pre-IPO Securities "at a discount to the prevailing private secondary market rate" and that investors in the Fund "will be investing in the company at a discount to the prevailing private market rate . . . ."

151. However, based on publicly available data concerning secondary market trading of Anduril Pre-IPO Securities at the time, the Investment Memorandum calculations of projected investor returns used the price paid *by TSG*, not the substantially higher price paid by Fund investors.

152. In fact, the Anduril Unit prices investors paid, inclusive of fees, ranged from approximately 29% to 57% higher than the price at which TSG acquired these Pre-IPO Securities.

153. The PPMs also falsely and misleadingly stated that the market value that investors were paying factored in price "appreciation" the Pre-IPO Securities; however, in fact, the short period between when TSG acquired the Pre-IPO Securities and when TSG offered Interests in the Funds suggests that there was no such market price appreciation before the sales of Interests in these Funds.

154. For example, despite the fact that TSG began purchasing Stripe Pre-IPO Securities on April 24, 2023, and began offering Units of Stripe in Fund 4 only a few days later on May 1,

2023, the Stripe Unit price paid by Fund 4 investors for Interests, inclusive of fees, was approximately 40% to 63% higher than the price at which TSG acquired these Pre-IPO Securities.

155. Based on publicly available data concerning secondary market trading of Stripe Pre-IPO Securities at the time, Stripe Pre-IPO Securities were available for purchase at approximately the price at which *TSG* acquired these Pre-IPO Securities.

156. Moreover, even after it began offering Interests in Fund 4 to investors, TSG purchased additional tranches of Stripe Pre-IPO Securities at a cost below what Fund 4 investors paid for Interests.

157. First, on June 23, 2023, TSG purchased additional tranches of Stripe Pre-IPO Securities at a cost of $26.51 per Unit *after* it had already begun selling Interests in Fund 4 to investors at between $35.50 and $37 per Unit.

158. Then, in September and December 2023, TSG continued to acquire additional Stripe Pre-IPO Securities for Fund 6 but purchased those securities at $28.40 and $27.12 per Unit, respectively, substantially below the $35.50 to $37 Unit prices TSG had already charged Fund 4 investors and below the $39.77 to $41.62 Unit prices TSG charged Fund 6 investors.

159. Moreover, based on then-available secondary market public trading data of Stripe Pre-IPO Securities, which Fund 4 held, those securities were available for purchase at approximately the prices at which *TSG* acquired them.

160. Likewise, for Fund 10, which held Pre-IPO Securities of Perplexity AI, a one-page document sent to investors falsely and misleadingly claimed that investors paid "an assessed market value, which is higher than the original purchase price" but that the calculated market value "takes into account current market conditions, secondary valuation ranges, and potential growth prospects."

161. Based on publicly available data concerning secondary market trading of Perplexity AI Pre-IPO Securities at the time Defendants sold Interests in Fund 10, these securities were available at approximately the prices at which TSG acquired these securities, whereas the Unit prices paid by Fund 10 investors were 32% to 45% higher.

**ii. Defendants Misled Investors by Claiming that the Funds Held Actual Shares of Pre-IPO Companies**

162. Further compounding Defendants' misleading statements, Defendants falsely and misleadingly told prospective investors—through the TSG Whitepaper and statements by sales agents—that the Pre-IPO Securities TSG or TSG Invest acquired were shares of stock in Pre-IPO Companies, generally purchased directly from existing shareholders.

163. For example, the TSG Whitepaper claimed that TSG "purchase[s] shares from selling shareholders (there is no dilution to the company because these are existing shares)[.]"

164. However, as noted above, TSG and TSG Invest purchased the vast majority of the Pre-IPO Securities held by the Funds by investing in other pre-IPO investment funds (like StraightPath's funds), not through direct purchases from shareholders.

165. Defendants' purchases of Pre-IPO Securities from other pre-IPO funds, rather than directly from shareholders, increased the risk to investors that the Funds would not actually own all the relevant Pre-IPO Securities underlying the Interests sold to investors.

166. Notably, TSG largely acquired the Pre-IPO Securities underlying Funds 1 and 2 through investment funds like StraightPath's funds, however StraightPath purported to hold shares of Pre-IPO Companies that it ultimately did not own.

167. Moreover, Fund investors were not only paying fees applied by Defendants, but also fees added by these other entities, reducing the potential returns to investors in the event of an IPO or other liquidity event.

168. Spaventa himself also directed sales agents to tell investors that the Funds held shares in the Pre-IPO Companies.

169. For example, in October 2021, Spaventa emailed sales agents a script concerning Kraken Pre-IPO Securities, which directed them to "close" calls with prospective investors by stating, "I want you to become an investor here at TSG and own **2,000** shares."

170. Similarly, in a February 2023 email to a new sales agent, Spaventa falsely explained that "TSG and the fund own the shares, the client owns units in the fund."

171. This sales training statement was consistent with statements by sales agents to investors to the effect that TSG held shares in Pre-IPO Companies.

172. For example, in a recorded call in or about February 2022, a sales agent pitching Fund 2 Units of Epic Games stated, "one of the things that's very important is when you look over that, you'll see that we own our Units or shares within our inventory. . . . We make sure that we have everything in inventory. We own the shares within our fund."

173. In another recorded call from around February 2023, a sales agent told a potential investor in Funds that held Anduril Pre-IPO Securities, "when you buy Anduril through us, you own the shares."

174. Contrary to Defendants' representations, TSG and TSG Invest did not, for the most part, purchase Pre-IPO Securities directly from shareholders but rather, purchased interests in other pre-IPO investment funds that purported to hold pre-IPO shares. Defendants' investments in pre-IPO funds accounted for over 90% of the Funds' Pre-IPO Securities.

### iii. Defendants Made False and Misleading Statements to Investors Concerning Expected Returns and Prior Performance

175. Spaventa trained sales agents—using scripts, rebuttals, and other materials—to make misleading statements regarding the Funds' expected returns and TSG's claimed track record of success.

176. As evidenced by sales agents' scripts and recorded calls with investors and prospective investors, sales agents repeatedly tied extraordinary projected investment returns to results TSG supposedly had achieved for past investors (whom they often referred to as "clients").

177. Similarly, the Apprenticeship Manual directed new sales agents to emphasize a high expected return on investment in their sales pitches and to compare the Funds' investment opportunity to a "previous investment which yielded a high return."

178. The TSG Whitepaper falsely stated that TSG had invested in Airbnb, Palantir, and SoFi, among other Pre-IPO Companies when, in fact, TSG had not invested in Pre-IPO Securities of any of these companies on behalf of its Funds or investors.

179. Likewise, a sales script concerning Kraken Pre-IPO Securities held by Fund 2 (the "Kraken Sales Script"), which Spaventa circulated to sales agents in October 2021, instructed sales agents to project that Kraken Units would increase from $88 to $250 following a Kraken IPO, without any basis for providing that projection.

180. The Kraken Sales Script also encouraged sales agents to compare Kraken to Coinbase by claiming that TSG had previously achieved significant success in Coinbase—asserting that "clients got [Coinbase] Pre-IPO shares in the private market at $40…and it EXPLODED to over $400 on its FIRST DAY OF TRADING!"—even though no Fund had ever invested in Coinbase Pre-IPO Securities.

181. A later version of the Kraken Sales Script, which was circulated to sales agents in February 2022, directed sales agents to tell investors that an investment in Interests backed by Kraken Pre-IPO Securities could create "over **800-1000% RETURN** on your investment."

182. Several recorded sales calls demonstrate that sales agents used the Kraken Sales Script, including the Coinbase comparison. For example, on a call in or around March 2022, a sales agent told a prospective investor that "[w]e believe when Kraken goes public, it's going to go public

at 450 plus, just like Coinbase and we had our clients in that at $40 pre-IPO and its first day of going public it hit $400."

183. Similarly, a sales script circulated by TSG management to sales agents for Anduril Pre-IPO Securities (the "Anduril Sales Script"), which Funds 3, 5, and 7 held, instructed sales agents to reassure hesitant investors by asserting that "we have been returning between 200% to 1,000% to our clients."

184. At least one sales agent followed the Anduril Sales Script, claiming on a recorded call in or around May 2022 with a potential investor: "We've been getting returns between 200 to 1,000% to our clients with our previous investments like Airbnb, Palantir, SpaceX before they went public. . . . And [Anduril is] probably going to give you a 500% return on your investment. . . . Like I said, we've worked with Airbnb, Palantir. Palantir . . . . I think we had that at $6 coming in and exited at $45…"

185. In their sales pitches to prospective Fund investors, agents at times also made statements that falsely and misleadingly minimized the possibility of investment losses.

186. For example, on a July 31, 2023, recorded call, a sales agent falsely told a prospective investor, "the lowest we've ever sold was 75% at SoFi, which is still an absolute win"—when, in fact, no Fund had ever invested in SoFi.

187. In another example, on a recorded call with a prospective investor in or around March 2021, a sales agent pitching Fund 2 Units of Epic Games falsely claimed, "we are averaging around 3, 4, 500% returns to our clients by investing in late-stage companies . . . like Airbnb, Palantir, SpaceX. We're very very lucky so far. We've never had a losing position"—when, in fact, none of the eleven Funds ever invested in Airbnb and Palantir and SpaceX had not yet had an IPO at that time.

### C. Defendants Misled Investors Concerning the Number of Available Units Remaining for Investment

188. Defendants' sales agents also routinely misrepresented to investors and prospective investors the number of available Units remaining for investment in the Funds.

189. The Apprenticeship Manual directed sales agents to convey a "sense of . . . scarcity of our investment offerings; we only keep a limited amount of our new investment offerings in reserve for new cold call clients."

190. In a recording of one in-person training session in or about February 2022, a TSG manager verbally provided sales agents sample language for them to use on investor calls to the effect that the number of remaining Units was limited, including phrases such as "we are definitely starting to scrape the barrel," without any regard for the actual number of Units remaining.

191. Spaventa drafted and/or approved sales scripts for specific Fund offerings that contained similar template language.

192. For example, in an October 2021 sales script for Fund 2 Units of Kraken, Spaventa wrote: "On this news, I want you to become an investor here at TSG and own 2,000 units . . . that's all we have left [client name]. Now you have 3 days to fund your investment."

193. Recorded calls confirm that sales agents followed the October 2021 Kraken sales script model language. For example, in a recorded call in or around February 2022, a sales agent told a prospective Fund 2 investor, "we're down to the last few Units" when, in reality, TSG had more than 5,000 Kraken Units in its inventory at that time.

## IV. DEFENDANTS' OFFERS AND SALES OF INTERESTS VIOLATED THE SECURITIES OFFERING REGISTRATION PROVISIONS

194. Defendants offered and sold the Interests without registering the offerings or sales with the Commission, and no exemption from registration appears to have applied for the reasons set forth in paragraphs 197–205 below.

195. The PPMs for each of the Funds claimed that the Fund was exempt from the Investment Company Act under either Section 3(c)(1) or Section 3(c)(7), which reflects an acknowledgement that the Funds were pooled investment vehicles.

196. Defendants purported to offer Interests in reliance on Rules 506(b) and 506(c) of Securities Act Regulation D [17 C.F.R. §§ 230.506(b), (c)]. Regulation D provides a safe harbor from securities sale registration for qualifying private placements—based on the registration exemption for "transactions by an issuer not involving any public offering" provided by Securities Act Section 4(a)(2).

197. Rule 506(b) creates a safe harbor from registration where a securities offering is made to no more than 35 non-accredited and an unlimited number of accredited investors; however, the offering may not use general solicitation or general advertising. 17 C.F.R. §§ 230.506(b), 502(c)

198. Defendants' use of general solicitation—cold calls to lead lists of prospective investors, as well as advertising on TSG's website and social media pages—disqualified the Fund offerings from the private placement exemption under Securities Act Section 4(a)(2) or the related Rule 506(b) safe harbor in Regulation D.

199. To qualify for the Rule 506(c) safe-harbor, all purchasers of the securities sold must be "accredited investors"—that is, individual investors with a net worth (with their spouse) of more than $1 million, annual income exceeding $200,000, or joint income exceeding $300,000, or who the issuer "reasonably believes" falls within those categories. 17 C.F.R. §§ 230.506(c)(1), 501(a)(5), (a)(6).

200. Under Rule 506(c)(2)(ii), the issuer of the securities must take reasonable steps to verify that the purchasers of the securities are accredited investors; such steps may include reviewing documentation, such as tax records and brokerage or bank account statements. 17 C.F.R. § 230.506(c)(2)(ii).

201. The PPMs for the Funds acknowledge the requirements of 17 C.F.R. § 230.506(c)(2)(ii) by noting that "the Fund will require that investors provide information sufficient for the Fund to verify each investor's status as an 'accredited investor.'"

202. The Handbook also directed sales agents to collect documentation to verify investors' status as accredited investors.

203. In practice, however, Defendants did not take any steps to verify representations made on accredited investor questionnaires; nor did they collect any of the types of documents identified in Rule 506(c)(2)(ii). Defendants relied instead on investor lists purchased by Spaventa and investor self-certification of accredited investor status.

204. Defendants did not take any steps to confirm that investors on the lists Spaventa purchased were accredited, even after receiving questionnaires from at least some investors in which the investors did not claim to qualify as accredited.

205. In addition, the Funds accepted various investors who did not complete the questions concerning accreditation, or who submitted investor questionnaires that on their face did not claim to be accredited.

## V. SPAVENTA AND TSG VIOLATED THE EXCHANGE ACT BROKER-DEALER REGISTRATION PROVISIONS

206. Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)] makes it unlawful for any broker or dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the Commission.

207. Spaventa and TSG violated these provisions by hiring, training, and supervising a network of more than 100 sales agents, who were not associated with a registered broker-dealer, and who instead worked at TSG's boiler-room-style offices to solicit investors in connection with the offer and sale of securities (i.e., Interests).

208. Sales agents provided prospective investors advice on the merits of their investments in the Funds and handled customer funds and paperwork relating to those investments.

209. Additionally, Spaventa drafted, reviewed, and approved the materials that sales agents used to solicit investors, including sales scripts, the Apprenticeship Manual, and the Handbook.

210. Spaventa made all hiring, firing, and compensation decisions regarding sales agents.

211. TSG paid the unregistered sales agents commissions—that is, a percentage of the amounts of money they raised for the Funds.

212. Even after Spaventa acquired Capital Advisors and began paying some sales agents through that entity in January 2025, he continued to use TSG and other entities he owns to pay sales agents that were not licensed or associated with registered broker-dealers.

213. Overall, in connection with the Funds, Spaventa and TSG paid approximately $11 million in commissions to these unregistered sales agents.

214. But, despite the fact that sales agents were paid commissions, the Handbook directed agents to "[n]ever mention commissions or even use the word 'commission[,]'" and instead directed sales agents to call it a "Referral Fee."

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(All Defendants)**

215. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

216. At various times during the Relevant Period, as alleged in paragraphs 34 through 62 and 83 through 193, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices,

schemes, or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

217. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Violations of Securities Act Section 17(a)**
**(Spaventa)**

218. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

219. As alleged in paragraphs 215 through 217, TSG, Capital Advisors, and Alpha Partners violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

220. At various times during the Relevant Period, Spaventa knowingly or recklessly provided substantial assistance to the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by TSG, Capital Advisors, and Alpha Partners.

221. By reason of the foregoing, Spaventa is liable for aiding and abetting TSG's, Capital Advisors', and Alpha Partners' violations of Securities Act Section 17(a), and unless enjoined, will again aid and abet these violations.

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

222. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

223. At various times during the Relevant Period, as alleged in paragraphs 34 through 62 and 83 through 193, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

224. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Control Person Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Spaventa)**

225. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

226. As alleged above in paragraphs 222 through 224, TSG, Capital Advisors, and Alpha Partners violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

227. At all relevant times, Spaventa was a control person of TSG, Capital Advisors, and Alpha Partners and was a culpable participant in the violations by TSG, Capital Advisors, and Alpha Partners of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

228. By reason of the foregoing, Spaventa is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by TSG, Capital Advisors, and Alpha Partners.

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Spaventa)**

229. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

230. As alleged above in paragraphs 222 through 224, TSG, Capital Advisors, and Alpha Partners violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

231. At various times during the Relevant Period, Spaventa knowingly or recklessly provided substantial assistance to the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by TSG, Capital Advisors, and Alpha Partners.

232. By reason of the foregoing, Spaventa is liable for aiding and abetting TSG's, Capital Advisors', and Alpha Partners' violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet these violations.

**SIXTH CLAIM FOR RELIEF**
**Violations of Advisers Act Section 206 and Rule 206(4)-8 Thereunder**
**(Spaventa, TSG, and Alpha Partners)**

233. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

234. During the Relevant Period, Spaventa, TSG, and Alpha Partners were investment advisers under the definition in Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)], and therefore owed a fiduciary duty to the Funds.

235. At various times during the Relevant Period, as alleged in paragraphs 34 through 82, Spaventa, through multiple entities, including TSG (before May 2024) and Alpha Partners (beginning in May 2024), provided investment advice to each of the Funds by selecting which Pre-IPO Securities to purchase, using Fund assets and proceeds from prior offerings to purchase those Pre-IPO Securities, pricing Interests sold to investors, and directing Defendants' sales agents to sell Interests to investors.

236. Spaventa, TSG, and Alpha Partners also received compensation for this investment advice in the form of markups on the prices of Pre-IPO Securities sold to the Funds.

237. During the Relevant Period, while acting as investment advisers, Spaventa, TSG, and Alpha Partners, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (i) employed a device, scheme, or artifice to defraud a client or prospective client; (ii) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client; (iii) acting as principal for their own account, knowingly sold securities to a client, without disclosing to such client in writing before the completion of such transaction the capacity in which they were acting and obtaining the consent of the client to such transaction; and/or (iv) engaged in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

238. By reason of the foregoing, Spaventa, TSG, and Alpha Partners, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Violations of Advisers Act Section 206 and Rule 206(4)-8 Thereunder**
**(Spaventa)**

239. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

240. As alleged in paragraphs 233 through 238, TSG and Alpha Partners violated Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

241. At various times during the Relevant Period, Spaventa knowingly or recklessly provided substantial assistance to the violations by TSG and Alpha Partners of Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) and Rule 206(4)-8 thereunder.

242. By reason of the foregoing, Spaventa is liable for aiding and abetting TSG's and Alpha Partners' violations of Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and unless enjoined, will again aid and abet these violations.

**EIGHTH CLAIM FOR RELIEF**
**Violations of Securities Act Sections 5(a) and 5(c)**
**(All Defendants)**

243. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

244. At various times during the Relevant Period, as alleged in paragraphs 194 through 205, Defendants, directly or indirectly, singly or in concert: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or

instruments of transportation, securities; and/or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell securities through the use or medium of a prospectus or otherwise.

245. No registration statement was filed or was in effect with the Commission for any of the securities offered or sold by the Defendants.

246. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**NINTH CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Violations of Securities Act Sections 5(a) and 5(c)**
**(Spaventa)**

247. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

248. As alleged in paragraphs 243 through 246, TSG, Capital Advisors, and Alpha Partners violated Securities Act Section 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

249. At various times during the Relevant Period, Spaventa knowingly or recklessly provided substantial assistance to the violations of Securities Act Section 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)] by TSG, Capital Advisors, and Alpha Partners.

250. By reason of the foregoing, Spaventa is liable for aiding and abetting violations of Securities Act Section 5(a) and (c), and unless enjoined, will again aid and abet these violations.

**TENTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)(1)**
**(Spaventa and TSG)**

251. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

252. At various times during the Relevant Period, as alleged in paragraphs 206 through 214, Spaventa and TSG, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances, or commercial bills.

253. By reason of the foregoing, Spaventa and TSG, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

**ELEVENTH CLAIM FOR RELIEF**
**Control Person Liability for Violations of Exchange Act Section 15(a)(1)**
**(Spaventa)**

254. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

255. As alleged in paragraphs 251 through 253, TSG violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

256. At all relevant times, Spaventa was a control person of TSG and was a culpable participant in TSG's violations of Exchange Act Section 15(a)(1) [15 U.S.C.§ 78o(a)].

257. By reason of the foregoing, Spaventa is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)] by TSG.

**TWELFTH CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Violations of Exchange Act Section 15(a)(1) (Spaventa)**

258. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

259. As alleged in paragraphs 251 through 253, TSG violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)] in selling the Interests.

260. At various times during the Relevant Period, Spaventa knowingly or recklessly provided substantial assistance to the Exchange Act Section 15(a)(1) violations by TSG.

261. By reason of the foregoing, Spaventa is liable for aiding and abetting TSG's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)], and unless enjoined, will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently, restraining and enjoining all Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly: (1) Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; and (2) Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently, restraining and enjoining Spaventa, TSG, and Alpha Partners, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

**III.**

Permanently, restraining and enjoining Spaventa and TSG, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)];

**IV.**

Permanently restraining and enjoining Spaventa from directly or indirectly, acting as, or being associated with, any broker, dealer, or investment adviser;

**V.**

Permanently restraining and enjoining Spaventa from, directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

**VI.**

Ordering Defendants to disgorge, on a joint and several basis, the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**VII.**

Ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

**VIII.**

Granting such other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: August 14, 2026
New York, New York

Respectfully submitted,

/s/ Elisa S. Solomon
Elisa S. Solomon
Sheldon L. Pollock
Lee A. Greenwood
George Stepaniuk
Margaret Spillane
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0427 (Solomon)
SolomonEl@sec.gov

*Attorneys for Plaintiff Securities and Exchange Commission*