**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SPAVENTA, THE SPAVENTA GROUP LLC, TSG CAPITAL ADVISORS LLC, and TSG ALPHA PARTNERS LLC,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **No. 1:26-cv-06958 (LAK)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

A. The Funds and the Alleged Markups ..... 4

B. Capital Advisors ..... 5

C. Alpha Partners ..... 5

D. The Funds 10 and 11 Offering Documents ..... 6

ARGUMENT ..... 7

POINT I
THE COMPLAINT DOES NOT PLEAD THE FRAUD CLAIMS AGAINST CAPITAL ADVISORS OR ALPHA PARTNERS WITH THE REQUIRED PARTICULARITY ..... 7

A. The Pleading Standards ..... 7

B. The Complaint Pleads No Misstatement by Capital Advisors (Rule 10b-5(b) and Section 17(a)(2)) ..... 9

C. The Complaint Pleads No Deceptive Conduct or Scienter by Capital Advisors (Rule 10b-5(a) and (c) and Section 17(a)(1)) ..... 12

D. The Negligence-Based Scheme Theory Under Section 17(a)(3) Fails Against Capital Advisors for the Same Reason ..... 13

E. The Complaint Pleads No Misstatement by Alpha Partners ..... 14

POINT II
THE COMPLAINT PLEADS NO ACT BY CAPITAL ADVISORS IN ANY SALE, AS SECTION 5 REQUIRES ..... 15

POINT III
ALPHA PARTNERS DID NOT ACT AS PRINCIPAL FOR ITS OWN ACCOUNT UNDER SECTION 206(3) ..... 16

A. Section 206(3) Reaches an Adviser That Sells or Buys for Its Own Account ..... 16

B. The Complaint Alleges That TSG and TSG Invest, Not Alpha Partners, Sold the Securities ..... 17

C. Release No. 1732 Does Not Extend Section 206(3) to Alpha Partners ..... 18

POINT IV
AT A MINIMUM, EVERY CLAIM AGAINST CAPITAL ADVISORS AND ALPHA PARTNERS MUST BE LIMITED TO THE PERIOD IN WHICH EACH IS ALLEGED TO HAVE HAD A ROLE ..... 19

POINT V
THE DERIVATIVE CLAIMS AGAINST MR. SPAVENTA MUST BE NARROWED WITH THE PRIMARY CLAIMS ........................................................ 20

A. A Derivative Claim Falls With the Primary Violation on Which It Depends ........................................................................................... 21

B. The Derivative Counts Also Lack Defendant-Specific Allegations ................ 21

POINT VI
DEFENDANTS RESERVE THEIR OBJECTIONS TO THE INJUNCTIVE RELIEF REQUESTED IN THE PRAYER ................................................................. 21

CONCLUSION ......................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................. 2, 7, 21

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) .................................................. 7

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ......................................... 7

*City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011) ................ 22

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) ....................................... 8

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987) ............ 7, 10

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ................................. 8, 18

*Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) ......................................................... 13

*Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S. Ct. 2296 (2011) ........................................................................................................ 8, 10, 14

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ..................................... 8, 13

*Lorenzo v. SEC*, 587 U.S. 71, 139 S. Ct. 1094 (2019) ..................................................... 8

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................................ 21

*SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941) ........................ 15

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ................................................................ 15

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................ 10, 12

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ..................................... 12, 22

*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022) ........................................... 8, 10, 12, 13

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) .................................. 15, 16, 19, 21

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012) ..................................................... 11

*SEC v. StraightPath Venture Partners, LLC*, No. 22 Civ. 3897 (LAK) (S.D.N.Y.) ........... 3

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ....................................8, 9, 11, 12, 14

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).......................................9

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190 (2d Cir. 2008) ....................................................................................13

**Statutes**

Securities Act of 1933 § 5, 15 U.S.C. § 77e ................................................ 4, 15, 19, 20

Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a) ...............................................passim

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b).............................. 7, 13, 20

Investment Advisers Act of 1940 § 206(3), 15 U.S.C. § 80b-6(3) ..........................passim

**Rules and Regulations**

17 C.F.R. § 240.10b-5 ..............................................................................................passim

Fed. R. Civ. P. 9(b)....................................................................................................2, 7, 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................1, 4, 7

Fed. R. Civ. P. 65(d).....................................................................................................22

**Other Authorities**

Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732, 1998 SEC LEXIS 1483 (July 17, 1998).............................................................................................17, 18

Defendants Andrew Spaventa, The Spaventa Group LLC ("TSG"), TSG Capital Advisors LLC ("Capital Advisors"), and TSG Alpha Partners LLC ("Alpha Partners") (collectively, "Defendants"), by their undersigned counsel, respectfully submit this memorandum of law in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss in part the Complaint (Dkt. 1) filed by Plaintiff Securities and Exchange Commission (the "Commission").

## PRELIMINARY STATEMENT

This is a pre-IPO fund case. The Commission alleges that, between December 2020 and June 2025 (the "Relevant Period"), Andrew Spaventa, through TSG, bought shares of pre-IPO companies, resold them to eleven private funds (the "Funds") at a markup, and then sold interests in the Funds (the "Interests") to investors without adequately disclosing the markup. Mr. Spaventa and TSG dispute those allegations and will answer and litigate them at the appropriate time. This motion for partial dismissal is about the other two defendants, Capital Advisors and Alpha Partners.

Capital Advisors is the trade name of a broker-dealer that has been registered with the Commission since 2008. Mr. Spaventa bought it in March 2024, and the Complaint alleges that it became placement agent for the Funds in December 2024. Alpha Partners is a registered investment adviser that the Complaint alleges became adviser to the Funds in May 2024. Compl. ¶¶ 20–21, 45. Alpha Partners therefore had no alleged role for the first three and a half years of the Relevant Period, and Capital Advisors had none for the first four. By the Commission's own chronology, roughly three-quarters of the $74 million at issue had been raised before Alpha Partners became adviser, and roughly ninety percent before Capital Advisors became placement agent. *Id.* ¶ 86. Further, eight of the eleven Funds had finished selling before Capital Advisors

did anything at all. Yet the Complaint charges both entities with every fraud and registration violation for the entire four-and-a-half-year Relevant Period, based on little more than shared offices, shared employees, and common ownership.

That is liability by affiliation, and the securities laws do not allow it. Even in an enforcement action, the Commission must plead what each defendant did, when it did it, and, where it alleges fraud, facts supporting the required state of mind. It has not done so here, and the failure matters. Capital Advisors and Alpha Partners are the two registered, regulated businesses in this case. For a broker-dealer and an investment adviser, being charged with fraud is itself a regulatory event, and one purpose of Rule 9(b) is to protect a defendant from having to answer a fraud charge the pleading does not support. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The defects are clearest as to Capital Advisors. Every dated misstatement in the Complaint (the sales calls, scripts, and emails from 2021 through 2023) predates Capital Advisors' alleged role by more than a year. The Complaint identifies no statement made by Capital Advisors, no deceptive act undertaken by it, no transaction that depended on it, and no facts showing that anyone acting for Capital Advisors knew of an alleged fraud. Allegations that it shared offices and personnel, paid registered representatives, and was identified in two offering documents as a compensated placement agent do not plead that Capital Advisors committed securities fraud or was a necessary participant in every unregistered offering conducted since 2020.

The pleading against Alpha Partners is also aggregated rather than particularized, and the Section 206(3) theory against it fails on the Commission's own facts. The Complaint alleges that TSG or TSG Invest Ventures LLC ("TSG Invest"), not Alpha Partners, owned and sold the

securities in the challenged principal transactions, and it assigns Alpha Partners no role other than having "facilitated" them. Compl. ¶ 78. Section 206(3) applies to an adviser that sells to a client "as principal for his own account." Facilitating another entity's sale is not that.

What the Complaint does say about the alleged fraud only underscores how little it says about these two entities. For example, the Commission concedes that every offering document, from the first Fund to the last, disclosed that TSG or its affiliates would profit on the sale of the securities to the Fund, and that in fact the Funds 3 through 9 documents illustrated the point with numbers. Compl. ¶¶ 90–92, 105–06, 140. The Commission's fraud theory is therefore that those disclosures were inadequate, not that there were none. And yet, the Complaint never says what Capital Advisors or Alpha Partners had to do with the words chosen in those disclosures.

Moreover, the Complaint's repeated references to *SEC v. StraightPath Venture Partners, LLC*, No. 22 Civ. 3897 (LAK), and to the convictions of StraightPath's principals, Compl. ¶¶ 24, 31–33, 88, 164–66, attempt to associate Defendants with the StraightPath fraud without alleging that any Defendant in the present case had any part in it. The Commission does not allege that any Defendant in this case was a StraightPath principal, or that anyone here did what StraightPath is alleged to have done, which was to sell fund interests in more pre-IPO securities than it owned. *Id.* ¶¶ 24, 166. Instead, the Commission alleges that Mr. Spaventa once raised money for StraightPath funds while at another firm, that TSG's early offering documents borrowed StraightPath's language, and that Funds 1 and 2 invested in StraightPath funds. *Id.* ¶¶ 31, 66, 88. Further, the Commission's own related-case statement acknowledges that "the defendants in the two actions are not overlapping and the investment funds and particular offerings at issue in the two actions are different." Dkt. 5 at 2. And the only Funds with any StraightPath connection, Funds 1 and 2, finished selling in January 2023, sixteen months before

Alpha Partners became adviser and nearly two years before Capital Advisors became placement agent. Compl. ¶ 86. Whatever StraightPath means for the Commission's case as a whole, and Defendants contend it means very little, it has nothing to do with the two entities this motion concerns.

Defendants therefore seek targeted relief. They ask the Court to dismiss the statement-based fraud theories that the Complaint does not plead adequately against Capital Advisors or Alpha Partners; dismiss the scheme and Section 5 theories against Capital Advisors; dismiss the Section 206(3) theory against Alpha Partners; and, at a minimum, limit every claim against each entity to the period in which the Complaint alleges it performed the role on which liability depends. The Court should also narrow the derivative claims against Mr. Spaventa correspondingly.

## BACKGROUND

### A. The Funds and the Alleged Markups

The Commission alleges that Defendants raised approximately $74 million from more than 800 investors for eleven private funds that held interests in pre-IPO companies. Compl. ¶¶ 2–5.[1] It alleges that TSG or TSG Invest acquired those interests, resold them to the Funds at marked-up prices, and that offering documents and sales personnel did not adequately disclose the resulting spread. *Id.* ¶¶ 63–86. It also alleges misrepresentations concerning valuation, ownership of underlying shares, projected returns, prior performance, and scarcity. *Id.* ¶¶ 131–93. The Complaint's own chart shows when each Fund was sold: Funds 1 through 8, which raised approximately $66 million of the $74 million, had completed their sales by August 2024,

[1] For purposes of this motion only, Defendants accept the well-pleaded factual allegations of the Complaint as true, as Rule 12(b)(6) requires. Defendants dispute many of those allegations and reserve all rights to contest them.

and Fund 9 sold between June 2024 and January 2025. *Id.* ¶ 86. Only Funds 10 and 11, which together raised approximately $5.2 million, sold entirely after December 2024. *Id.*

**B. Capital Advisors**

The Complaint alleges that Capital Advisors is a trade name used by Brightchoice Financial, LLC, a broker-dealer registered with the Commission since 2008. Compl. ¶ 20. Mr. Spaventa acquired Brightchoice in or about March 2024, began operating it as Capital Advisors in May 2024, and allegedly began using it as placement agent for the Funds in December 2024. *Id.* ¶¶ 20, 45. The Complaint alleges that certain sales agents became associated with Capital Advisors beginning in April 2024, that those registered representatives received commissions from Capital Advisors between January and June 2025, and that the private placement memoranda ("PPMs") for Funds 10 and 11 disclosed that Capital Advisors would receive a commission or placement fee for each transaction it completed. *Id.* ¶¶ 20, 51, 111–12, 212. A one-page document sent to certain Fund 10 investors described the placement fee as 10%. *Id.* ¶ 114.

**C. Alpha Partners**

Mr. Spaventa formed Alpha Partners in November 2021, and it allegedly became investment adviser to nine of the eleven Funds in May 2024; it registered with the Commission as an investment adviser in February 2025. Compl. ¶¶ 21, 45. The Complaint alleges that Mr. Spaventa and certain sales agents were associated with Alpha Partners as investment adviser representatives before May 2024, but it does not allege that Alpha Partners advised any Fund before then; to the contrary, it alleges that TSG advised the first three Funds until May 2024 and that two unnamed entities advised Funds 4 through 11. *Id.* ¶¶ 18–19, 21, 44–45, 235.

The Commission alleges that Alpha Partners received investor money, paid sales agents during unspecified periods, "facilitated" principal transactions, and was identified in the PPMs for Funds 10 and 11 as receiving an investment adviser fee. *Id.* ¶¶ 49, 51, 78, 111–12. Paragraph 49, the only allegation quantifying what either entity received, names Alpha Partners twice as the recipient of two different amounts ($750,000 and $465,000) and then refers to "these entities" in the plural; it never names Capital Advisors.

**D. The Funds 10 and 11 Offering Documents**

Defendants submit the Funds 10 and 11 PPMs, which the Complaint quotes and relies on, *id.* ¶¶ 110–13, 140, as Exhibits A and B to the accompanying Declaration of Jonathan E. Goldberg ("Goldberg Decl."). Each states that "the Manager receives income, in addition to the [fund fee / placement fee], that is generated from the sale of interests with an underlying price per share of the Portfolio Company that is higher to the Fund than the price per share paid by affiliates of the Manager," illustrates the point with numbers (the affiliate buys at $10 and sells to the Fund at $12), and states that "[a]ny profit made in connection with the sale at the higher 'market value' will be received by the Manager's affiliates . . . and will not be shared with the Fund or its Members." Goldberg Decl. Ex. A at 6–7; Ex. B at 6–7.

Each PPM also discloses that Capital Advisors "shall receive a commission" (Fund 10) or "placement fee" (Fund 11) "for each transaction it completes for the Fund," that Alpha Partners (which the PPMs call "TSG Alpha") "will receive an Investment Advisor Fee . . . regardless of whether the Fund Interests appreciate or decline in value," that none of the compensation arrangements among the Fund, the Manager, Alpha Partners, and the broker-dealer "resulted from arm's length negotiations," and that "[t]he Principal will benefit from the receipt of Carried Interest, Investment Advisor Fee, and brokerage commissions." *Id.*

# ARGUMENT

## POINT I

## THE COMPLAINT DOES NOT PLEAD THE FRAUD CLAIMS AGAINST CAPITAL ADVISORS OR ALPHA PARTNERS WITH THE REQUIRED PARTICULARITY

The Commission's two fraud claims, Claim One under Section 17(a) of the Securities Act and Claim Three under Section 10(b) of the Exchange Act and Rule 10b-5, are pleaded against all four Defendants in identical terms. Compl. ¶¶ 215–17, 222–24. The Complaint does not say which Defendant made which statement or which Defendant did what. As to Capital Advisors and Alpha Partners, that is because there is nothing to say. The Complaint identifies no misstatement by either entity and no deceptive conduct by Capital Advisors. However the Commission casts its theory, as a misstatement claim or a scheme claim, it has not pleaded one against these two Defendants, and at a minimum it cannot reach conduct that predates their alleged roles.

### A. The Pleading Standards

To survive Rule 12(b)(6), a complaint must contain facts making liability plausible, not labels, conclusions, or a formulaic recitation of elements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Claims sounding in fraud must also satisfy Rule 9(b) by specifying the fraudulent statements or conduct, identifying the responsible actor, stating when and where the conduct occurred, and explaining why it was fraudulent. *ATSI*, 493 F.3d at 99. Where a complaint charges multiple defendants, it must inform each defendant of the nature of its alleged participation. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). In applying them, the Court may consider documents that the complaint incorporates by reference or "relies heavily upon," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010), and need not

credit general allegations that are "belied by more specific allegations of the complaint," *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995). These requirements apply to the Commission's scheme claims as well as its misstatement claims. *SEC v. Wey*, 246 F. Supp. 3d 894, 916 (S.D.N.Y. 2017) (applying Rule 9(b) to scheme claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3), and dismissing them where the complaint did not link the defendant's conduct to a particular transaction or time).

Section 17(a) and Rule 10b-5 each have three subsections. They overlap, but they impose different requirements. Rule 10b-5(b) reaches material misstatements and omissions by the person with ultimate authority over the statement. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43, 131 S. Ct. 2296, 2302 (2011). Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) address deceptive schemes and courses of conduct. Section 17(a)(2) prohibits obtaining money or property by means of a material misstatement or omission. 15 U.S.C. § 77q(a). A person who did not "make" a statement may incur scheme liability for disseminating it with intent to defraud, *Lorenzo v. SEC*, 587 U.S. 71, 78–79, 139 S. Ct. 1094, 1100–01 (2019), but misstatements and omissions alone cannot be repackaged as a scheme; the scheme subsections require "something beyond misstatements and omissions, such as dissemination." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49, 53–54 (2d Cir. 2022); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). That rule applies in Commission enforcement actions. *Rio Tinto*, 41 F.4th at 54. The Complaint must therefore plead the elements of each theory against each defendant.

Rule 9(b) permits a plaintiff to allege state of mind generally, but the Second Circuit still requires facts giving rise to a strong inference of fraudulent intent, and courts in this District apply that standard to the Commission's scienter-based claims. *Shields v. Citytrust Bancorp,*

*Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *Wey*, 246 F. Supp. 3d at 916 (applying the standard to the Commission's scheme-liability claims). Sections 17(a)(2) and 17(a)(3), by contrast, require only negligence, so the arguments below on those subsections turn on what Capital Advisors and Alpha Partners are alleged to have done, not on what they knew.

**B. The Complaint Pleads No Misstatement by Capital Advisors (Rule 10b-5(b) and Section 17(a)(2))**

The Complaint identifies no statement made by Capital Advisors. It does not allege that Capital Advisors authored or had ultimate authority over any PPM, confirmation letter, script, whitepaper, website, email, or sales call. Paragraph 87 alleges that Mr. Spaventa drafted or approved the offering documents. The only statements about Capital Advisors that the pleading identifies are disclosures in the Funds 10 and 11 PPMs that Capital Advisors "shall receive" a commission or placement fee for each transaction it completes, Compl. ¶ 111, and a one-page document, attributed to no one, describing the placement fee as 10%, *id.* ¶ 114. The Complaint does not allege that either is false. The Complaint itself acknowledges that the PPMs disclosed that those fees were not determined at arm's length, *id.* ¶ 112, and the PPMs go further: they disclose that Mr. Spaventa, as owner of the broker-dealer, would benefit from its commissions. Goldberg Decl. Ex. A at 19; Ex. B at 20. A disclosed, conflicted fee is not a misstatement.

The Complaint dates every misstatement it identifies to 2021 through 2023, including the October 2021 and February 2022 Kraken scripts and calls (Compl. ¶¶ 169, 179–82, 192–93), the March 2021 and February 2022 Epic Games calls (*id.* ¶¶ 172, 187), the Anduril script and the May 2022 and February 2023 Anduril calls (*id.* ¶¶ 127, 173, 183–84), the July 2022 Kraken call (*id.* ¶ 124), the February 2023 Fund 4 email (*id.* ¶ 126), and the July 2023 SoFi call (*id.* ¶ 186). All of them predate December 2024, the first date on which the Complaint alleges Capital Advisors had any role. The only communications the Complaint alleges after that date are Mr.

Spaventa's March 2025 email, which it attributes to him personally (*id.* ¶ 128), and the Fund 10 one-page document, which it attributes to no one (*id.* ¶¶ 114, 160). The Complaint alleges that some sales agents became registered representatives of Capital Advisors and received commissions from it in 2025, *id.* ¶ 20, but it does not identify a single call, email, or statement by any of them in that capacity, to any investor, concerning any Fund. The Commission cannot charge a broker-dealer with its representatives' misstatements without identifying one. Nor can the Commission fall back on the presumption that insiders or affiliates "participating in the offer of the securities in question" are answerable for an offering memorandum's contents. *DiVittorio*, 822 F.2d at 1247. Whatever the continued force of that presumption after *Janus*, it attributes an offering document to those who participated in the offering it describes. It does not attribute the Funds 1 through 9 offering documents to an entity that the Complaint does not allege had any role in those offerings, and the only offering documents that mention Capital Advisors contain no statement about it that the Complaint alleges is false.

Further, Rule 10b-5(b) reaches the person or entity with ultimate authority over the statement, *Janus*, 564 U.S. at 142–43, and that requirement applies when the Commission is the plaintiff. *Rio Tinto*, 41 F.4th at 52 (holding that individual defendants who did not make the challenged statements "cannot be primarily liable under Rule 10b-5(b)" in Commission action); *SEC v. Kelly*, 817 F. Supp. 2d 340, 342–43 (S.D.N.Y. 2011). The Complaint therefore does not plead a Rule 10b-5(b) violation by Capital Advisors.

The Section 17(a)(2) theory fails for a related but distinct reason. Section 17(a)(2) does not require that the defendant have "made" the statement, *Rio Tinto*, 41 F.4th at 50 n.2; *SEC v. Stoker*, 865 F. Supp. 2d 457, 464–65 (S.D.N.Y. 2012), but it does require that the defendant have obtained money or property "by means of" a specified material misstatement or omission. 15

U.S.C. § 77q(a)(2). "It is not sufficient that a materially untrue statement was made and the person also made money"; the Commission must plausibly allege that the money was obtained by means of the false statement, and "if the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie." *Wey*, 246 F. Supp. 3d at 915 (dismissing Section 17(a)(2) claim). The Complaint does not meet that standard as to Capital Advisors.

Paragraph 49, the only allegation quantifying receipts, names Alpha Partners twice and never names Capital Advisors. Defendants assume the Commission intended to name Capital Advisors as the recipient of one of the two amounts, but the allegation does not say so, and even read that way it alleges only that Capital Advisors received an unspecified sum of "investor money" at an unspecified time and used it to pay sales agents and operating expenses. It does not connect that money to any identified misstatement. The remaining allegations, that Capital Advisors paid registered representatives and was entitled under a disclosed PPM provision to a commission or placement fee for each transaction it completed, describe compensation Capital Advisors would have earned whether or not any statement by anyone was false. Compl. ¶¶ 20, 51, 111–14; Goldberg Decl. Ex. A at 11; Ex. B at 11 (placement fee payable "for each transaction it completes for the Fund"). That is precisely the showing *Wey* held insufficient. The Court should dismiss the Rule 10b-5(b) and Section 17(a)(2) theories as to Capital Advisors.

**C. The Complaint Pleads No Deceptive Conduct or Scienter by Capital Advisors (Rule 10b-5(a) and (c) and Section 17(a)(1))**

The scheme theories also fail. Scheme liability "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly*, 817 F. Supp. 2d at 344; *accord Wey*, 246 F. Supp. 3d at 917; *Rio Tinto*, 41 F.4th at 53–54. The pleaded acts are that Capital Advisors shared offices and employees with TSG, served as placement agent beginning

in December 2024, paid commissions to registered representatives during 2025, and was identified in two PPMs as a compensated participant. Compl. ¶¶ 20, 45, 51, 111–12. The Complaint does not allege that any of them is deceptive in itself. The pleading identifies no Capital Advisors transaction, communication, instruction, concealment, or other act distinct from the alleged misstatements, and, as shown above, it identifies no misstatement by Capital Advisors either.

The Commission also fails to plead facts supporting scienter attributable to Capital Advisors. Agency principles may make an entity answerable in a Commission enforcement action for an employee's conduct within the scope of his authority. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812–13 (2d Cir. 1975). But the Second Circuit imposed liability in *Management Dynamics* because the employee submitted the fictitious quotations "in the firm's name," so that the employment relationship "identified the firm as their source," and the court expressly declined to decide how far agency principles extend beyond those facts. *Id.* at 813. Here the Complaint supplies no such nexus. Although it alleges that Mr. Spaventa controlled Capital Advisors and was one of its registered representatives, it does not connect any identified false statement or deceptive act to conduct he undertook in Capital Advisors' name or within the scope of that role. Nor does it allege that Capital Advisors authorized, issued, or disseminated a challenged statement. *Cf. Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008) (corporate scienter requires pleading facts connecting the state of mind of an agent to the challenged statement attributed to the entity); *Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020) (affirming dismissal where the complaint "provide[d] no connective tissue between those employees and the alleged misstatements"). Ownership and control do not dispense with allegations connecting the individual's scienter to

conduct undertaken for the entity charged. The Court should therefore dismiss the scienter-based theories against Capital Advisors under Section 17(a)(1), Section 10(b), and Rule 10b-5.

**D. The Negligence-Based Scheme Theory Under Section 17(a)(3) Fails Against Capital Advisors for the Same Reason**

Section 17(a)(3) reaches a defendant who engages in a transaction, practice, or course of business that operates as a fraud or deceit upon the purchaser. It requires no scienter, but it does require a deceptive act or course of conduct by the defendant. 15 U.S.C. § 77q(a)(3). The absence of a scienter allegation is therefore not the answer to this subsection; the absence of any deceptive conduct is. And where the alleged scheme consists solely of misstatements or omissions, the Commission cannot use Section 17(a)(3) to duplicate the statement-based theory. *Rio Tinto*, 41 F.4th at 49, 53–54; *Lentell*, 396 F.3d at 177.

The Complaint pleads no act by Capital Advisors capable of operating as a fraud or deceit. It alleges that Capital Advisors served as placement agent from December 2024, shared offices and employees with an affiliate, paid registered representatives, and was disclosed in two offering documents as a compensated participant. Compl. ¶¶ 20, 45, 51, 111–12. The Complaint does not allege that Capital Advisors performed any of those facially neutral acts deceptively, and it does not explain how any act by Capital Advisors, as distinguished from conduct it attributes collectively to "Defendants," operated as a fraud or deceit upon a purchaser. The Section 17(a)(3) theory fails on its own terms.

**E. The Complaint Pleads No Misstatement by Alpha Partners**

The Complaint likewise identifies no statement made by Alpha Partners and does not allege that Alpha Partners had ultimate authority over any offering document. It does not even say which nine of the eleven Funds Alpha Partners advised, or which Funds the two unnamed entities advised instead. Compl. ¶¶ 21, 44. Its allegations concern Alpha Partners' advisory role,

payment of sales agents during unidentified periods, receipt of investor funds at unidentified times, and alleged facilitation of principal transactions. *Id.* ¶¶ 21, 45, 49, 51, 78. Those allegations may be directed to other statutory theories, but they do not plead a Rule 10b-5(b) statement by Alpha Partners. *Janus*, 564 U.S. at 142–43. Nor do they plausibly identify money or property Alpha Partners obtained by means of a specified false statement, as Section 17(a)(2) requires. *Wey*, 246 F. Supp. 3d at 914–15. The Complaint alleges that Alpha Partners was entitled to a disclosed "Investment Advisor Fee," Compl. ¶ 111, which the PPMs state would be paid "regardless of whether the Fund Interests appreciate or decline in value," Goldberg Decl. Ex. A at 23; Ex. B at 24, and that it received investor money that it used to pay sales agents and expenses, Compl. ¶ 49. It does not allege that Alpha Partners obtained any of that money because a statement was false rather than true. The Court should dismiss those portions of Claims One and Three as to Alpha Partners.

## POINT II

## THE COMPLAINT PLEADS NO ACT BY CAPITAL ADVISORS IN ANY SALE, AS SECTION 5 REQUIRES

Claim Eight is the registration claim. It alleges that all four Defendants offered and sold unregistered securities in violation of Securities Act Sections 5(a) and 5(c). Compl. ¶¶ 243–46. As to Capital Advisors, the Complaint pleads no act in any sale, before or after December 2024, the date on which it first alleges Capital Advisors had any role.

Section 5 is a strict-liability provision, but it does not impose liability merely because an entity later became affiliated with a participant in an offering. A person who did not itself pass title may be liable only if it was a "necessary participant" in the distribution, that is, if "but for the defendant's participation, the sale transaction would not have taken place," such that its acts

"were a substantial factor in the sale transactions." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020) (quotation omitted); *see SEC v. Frohling*, 851 F.3d 132, 136–37 (2d Cir. 2016); *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941). That test cannot be met for any sale that closed before Capital Advisors had a role, a point addressed in Point IV below. It is not met for the later sales either.

The Complaint alleges in conclusory terms that every Defendant offered or sold every Interest. Compl. ¶¶ 36, 244. Its Capital Advisors-specific allegations do not identify a purchaser solicited by Capital Advisors, a sale it completed, an offering document it distributed, investor funds it transmitted, or any act without which a sale would not have occurred. The allegation that it became placement agent in December 2024 is a title, not a description of conduct. The allegation that it paid registered representatives between January and June 2025 does not identify what those representatives did, for which Fund, or in which sale. And the PPMs' statement that Capital Advisors would be compensated for each transaction it completed describes an entitlement, not an act; the Complaint never alleges that Capital Advisors completed any identified transaction. *Id.* ¶¶ 20, 45, 51, 111–12. In *Sason*, by contrast, the defendants were necessary participants because the complaint alleged that each approved, originated, or negotiated the specific transactions at issue. 433 F. Supp. 3d at 514. The Complaint alleges nothing comparable here. The Court should dismiss Claim Eight as to Capital Advisors.

## POINT III

## ALPHA PARTNERS DID NOT ACT AS PRINCIPAL FOR ITS OWN ACCOUNT UNDER SECTION 206(3)

Claim Six is the Advisers Act claim. It alleges that Mr. Spaventa, TSG, and Alpha Partners violated Sections 206(1), 206(2), 206(3), and 206(4) and Rule 206(4)-8. Compl. ¶¶ 233–

38. This Point is directed only to Section 206(3), and only as asserted against Alpha Partners. Section 206(3) applies to an adviser that sells securities to a client as principal for its own account. The Complaint alleges that TSG and TSG Invest, not Alpha Partners, sold the securities, and the Commission's own interpretive release does not change that. Defendants reserve all defenses to the remaining theories in Claim Six.

**A. Section 206(3) Reaches an Adviser That Sells or Buys for Its Own Account**

Section 206(3) makes it unlawful for an investment adviser, "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client," or, "acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client," without the required written disclosure and consent. 15 U.S.C. § 80b-6(3). The provision is transaction-specific and turns on the capacity in which the adviser acted. As the Commission itself has explained, "[i]n a principal transaction, an adviser, acting for its own account, buys a security from, or sells a security to, the account of a client." Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732, 1998 SEC LEXIS 1483, at *4 (July 17, 1998). The Complaint adopts the same definition: a principal transaction occurs "when an investment adviser buys securities from, or sells securities to, a client using the firm's own account or inventory." Compl. ¶ 79.

**B. The Complaint Alleges That TSG and TSG Invest, Not Alpha Partners, Sold the Securities**

The Complaint's own description of the transactions defeats the theory. Paragraph 78, the allegation on which the Commission's principal-transaction claim rests, states:

> Because TSG or TSG Invest sold Pre-IPO Securities to the Funds, and because TSG, TSG Invest, and the Funds were all controlled by Spaventa, these transactions were principal transactions that were facilitated by Spaventa, TSG, and Alpha Partners.

Compl. ¶ 78. That allegation identifies the seller, and the seller is not Alpha Partners: "TSG or TSG Invest sold" the securities. Its reason for calling the transactions principal transactions is common control of TSG, TSG Invest, and the Funds, a rationale that does not depend on, or even mention, Alpha Partners' ownership of anything. And the only role the Complaint assigns to Alpha Partners is that it "facilitated" the transactions. Facilitation is not principal capacity. An adviser that assists a transaction between other parties does not thereby sell a security "for his own account."

The rest of the Complaint says the same thing. It alleges that Mr. Spaventa caused TSG and TSG Invest, "two entities he wholly owned," to acquire the Pre-IPO Securities and to sell them to the Funds, that those entities were the parties to the equity transfer agreements, and that Mr. Spaventa signed those agreements on behalf of TSG. Compl. ¶¶ 63, 74. Alpha Partners appears nowhere in that chain. The Complaint does not allege that it held the securities in its own account or inventory, sold them, was a party to any transfer agreement, or received the purchase price as seller. The Funds 10 and 11 PPMs on which the Commission relies describe the same structure: the Manager's affiliates acquire the securities and sell them to the Fund, "[a]ny profit . . . will be received by the Manager's affiliates," and Alpha Partners' role is to "advise the Manager" on "originating, analyzing, and recommending investment opportunities" in exchange for an advisory fee. Goldberg Decl. Ex. A at 6–7, 19; Ex. B at 6–7, 20.

Against that, the Commission offers only the recital in Paragraph 237 that Mr. Spaventa, TSG, and Alpha Partners, "acting as principal for their own account, knowingly sold securities to a client." Compl. ¶ 237. That sentence tracks the statutory language and names three defendants collectively. It does not allege that Alpha Partners owned or sold anything, and it conflicts with Paragraph 78's identification of TSG and TSG Invest as the sellers. "General, conclusory

allegations need not be credited . . . when they are belied by more specific allegations of the complaint." *Hirsch*, 72 F.3d at 1092.

**C. Release No. 1732 Does Not Extend Section 206(3) to Alpha Partners**

Release No. 1732 does not eliminate that defect. The Commission there noted that it and its staff had applied Section 206(3) "to certain situations in which an adviser causes a client to enter into a principal or agency transaction that is effected by a broker-dealer that controls, is controlled by, or is under common control with, the adviser." 1998 SEC LEXIS 1483, at *2 n.3. The Complaint does allege that TSG acted as an unregistered broker-dealer, but the conduct it identifies is soliciting investors to buy Interests in the Funds, not effecting the Funds' purchases of Pre-IPO Securities. Compl. ¶¶ 206–14. As to those purchases, the Complaint alleges that TSG and TSG Invest were the owners and sellers of the securities, not brokers that "effected" a transaction for the Funds' account. *Id.* ¶¶ 63, 74, 78. A footnote describing staff no-action positions cannot, in any event, rewrite the statutory requirement that the adviser act "as principal for his own account." Because the Complaint does not plead that Alpha Partners acted in either capacity specified by Section 206(3), the Court should dismiss Claim Six insofar as it asserts a primary violation of that subsection by Alpha Partners.

## POINT IV

## AT A MINIMUM, EVERY CLAIM AGAINST CAPITAL ADVISORS AND ALPHA PARTNERS MUST BE LIMITED TO THE PERIOD IN WHICH EACH IS ALLEGED TO HAVE HAD A ROLE

If any claim against Capital Advisors or Alpha Partners survives, it must be confined in time. The Complaint defines the Relevant Period as December 2020 through at least June 2025 and asserts Claims One, Three, and Eight against all Defendants for conduct "[a]t various times during the Relevant Period," without saying which times apply to which Defendant. Compl. ¶¶ 2,

216, 223, 244. Claim Six acknowledges that Alpha Partners' advisory role began in May 2024, *id.* ¶ 235, but then charges it for the entire Relevant Period anyway, *id.* ¶ 237. But by the Complaint's own allegations, Alpha Partners did not become adviser to any Fund until May 2024, and Capital Advisors did not become placement agent until December 2024. *Id.* ¶¶ 20–21, 45, 235. Neither entity can be liable for offers, sales, statements, or transactions completed before it assumed the role on which liability depends.

The point is concrete. The Complaint's own chart shows that Funds 1 through 8, which raised approximately $66 million of the $74 million at issue, finished selling by August 2024, and that Fund 9 finished in January 2025. Compl. ¶ 86. For the Section 5 claim, the rule follows directly from the standard: a defendant who did not pass title is liable only as a "necessary participant" whose acts were a but-for cause of the sale, *Sason*, 433 F. Supp. 3d at 513, and nothing Capital Advisors did in or after December 2024 could have caused a sale that closed in 2021, 2022, or 2023. For the fraud claims, every dated misstatement in the Complaint predates both entities' roles. *See* Point I.B, above. For the Advisers Act claim, the Complaint itself alleges that TSG, not Alpha Partners, advised the Funds until May 2024. Compl. ¶¶ 19, 44, 235.

The Commission may point to its allegations that Mr. Spaventa and certain sales agents were associated with Alpha Partners as investment adviser representatives as early as 2022. Compl. ¶¶ 18, 21. But an individual's registration through an entity is not an allegation that the entity advised a Fund, sold an Interest, or made a statement, and the Complaint fixes the start of Alpha Partners' advisory role in May 2024. *Id.* ¶¶ 4, 45, 235. Accordingly, to the extent any of Claims One, Three, and Eight survives as against Capital Advisors, the Court should limit it to conduct on or after December 2024; to the extent any of Claims One, Three, and Six survives as against Alpha Partners, the Court should limit it to conduct on or after May 2024; and leave to

replead for earlier periods should be granted only if the Commission can identify conduct by the particular entity in a particular transaction before those dates.

**POINT V**

**THE DERIVATIVE CLAIMS AGAINST MR. SPAVENTA MUST BE NARROWED WITH THE PRIMARY CLAIMS**

Five Claims charge Mr. Spaventa not with his own primary violations but with responsibility for the entities' violations. Claims Two, Five, and Nine allege that he aided and abetted the entities' violations of Section 17(a), Section 10(b), and Sections 5(a) and 5(c), respectively; Claim Four alleges control-person liability for the entities' violations of Section 10(b); and Claim Seven alleges that he aided and abetted violations of Advisers Act Section 206 by TSG and Alpha Partners. Compl. ¶¶ 218–21, 225–32, 239–42, 247–50. Each depends on a primary violation by TSG, Capital Advisors, or Alpha Partners. Defendants do not move to dismiss these Claims outright. They ask only that each be narrowed to match whatever primary theories survive. The derivative counts are also deficient in their own right.

**A. A Derivative Claim Falls With the Primary Violation on Which It Depends**

A control-person or aiding-and-abetting claim cannot survive without the primary violation on which it depends. *ATSI*, 493 F.3d at 108; *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012); *Sason*, 433 F. Supp. 3d at 513 (dismissing aiding-and-abetting claims where no primary violation was stated). Dismissal of any primary theory against Capital Advisors or Alpha Partners therefore requires dismissal of the corresponding derivative theory against Mr. Spaventa.

**B. The Derivative Counts Also Lack Defendant-Specific Allegations**

The derivative counts are independently deficient to the extent they rely on collective recitations. They do not identify what Mr. Spaventa knew about a particular primary violation by

Capital Advisors or Alpha Partners, when he knew it, or what substantial assistance he provided to that entity's violation. The allegations concerning his conduct for TSG cannot substitute for defendant-specific allegations concerning entities that allegedly assumed different regulated roles years later.

**POINT VI**

**DEFENDANTS RESERVE THEIR OBJECTIONS TO THE INJUNCTIVE RELIEF REQUESTED IN THE PRAYER**

The Prayer for Relief asks the Court to enjoin Defendants from "violating" the statutes cited in the Complaint and to bar Mr. Spaventa permanently from associating with any broker, dealer, or investment adviser and from participating in the issuance, purchase, offer, or sale of any security. Compl., Prayer ¶¶ I–V. Defendants recognize that the Court determines the scope of equitable relief in a Commission action after liability, on a developed record, and they do not ask the Court to address remedies now. They note the following so that the point is preserved.

Injunctive relief in a Commission action is not automatic. It requires a showing of "a reasonable likelihood that the wrong will be repeated," *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975), and any injunction must comply with Rule 65(d) and "be more specific than a simple command that the defendant obey the law," *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quotation omitted). The Complaint's only allegation about future conduct is the recital in Paragraph 9 that Defendants "will engage" in similar conduct unless enjoined. It alleges conduct "through at least June 2025," not conduct that is ongoing. Compl. ¶ 2. And its own allegations are that Mr. Spaventa registered the business with the Commission: he acquired a Commission-registered broker-dealer, became a registered representative of it, and registered Alpha Partners as an investment adviser. *Id.* ¶¶ 18, 20–21. The bars sought in Prayer Paragraphs IV and V would end his career. Whether allegations about the

adequacy of markup disclosures that the offering documents concededly made could support relief of that kind is a question for a record, not a pleading. Defendants reserve all objections to the relief requested.

## CONCLUSION

Defendants respectfully request that the Court enter an Order: (1) as to Capital Advisors, dismissing Claims One, Three, and Eight or, in the alternative, limiting those Claims to conduct on or after December 2024; (2) as to Alpha Partners, dismissing the misstatement theories in Claims One and Three and the Section 206(3) theory in Claim Six, and limiting Claims One, Three, and Six to conduct on or after May 2024; and (3) as to Mr. Spaventa, dismissing Claims Two, Four, Five, Seven, and Nine to the extent they depend on any primary theory dismissed or limited under paragraphs (1) and (2).

Dated: New York, New York
October 23, 2026

Respectfully submitted,

OBERHEIDEN P.C.

By: ______________________

Jonathan E. Goldberg
John Sellers
30 Wall Street, 8th Floor
New York, New York 10005
Tel.: (917) 570-7684
goldberg@federal-lawyer.com
john@federal-lawyer.com
Attorneys for Defendants